FILED
APR 1 0 2007
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **JAMES VOISIN, LARRY A. SAUCE, VELMA V. BORCH, ERNEST BURNS, WINONA V. KNIGHT, CHARLES L. JOHNSON, SR., and VERA V. COMPTON,** | * | **NO. 07-54 L (filed March 14, 2007)** |
| **Plaintiffs,** | * | **HON. JUDGE LYNN J. BUSH** |
| **VERSUS** | * | |
| **THE UNITED STATES OF AMERICA,** | * | |
| **Defendant.** | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

## AMENDED AND TRANSFERRED CLASS ACTION COMPLAINT

**NOW INTO COURT**, through undersigned counsel, come James Voisin, Larry A. Sauce, Velma V. Borch, Ernest Burns, Winona V. Knight, Charles L. Johnson, Sr., and Vera V. Compton, who respectfully represent the following to this Honorable Court:

## I.

## INTRODUCTION

1.

In 1788, Don Estevan Miro, the Governor of the Spanish Province of Louisiana, bestowed upon Jean Voisin, a Frenchman who was born in 1750 and came to Louisiana soon thereafter, an "Order of Survey," granting him the exclusive right to an uninhabited island off the coast of Louisiana called l'Isle Longue. For the next thirty years until his death in 1820, Jean Voisin lived

and worked on l'Isle Longue. During that time, Louisiana became a province of France and, in turn, was sold to the United States. When the United States purchased this province, it expressly preserved all property rights of those persons who had received valid land grants from the Spanish government, but later required any such grants be confirmed by Congress. After Jean Voisin's death, his son, Jean Joseph Voisin, submitted his property claim and supporting documentation to the federal land office, which then determined it to be valid and submitted it to Congress. In 1835, Congress expressly confirmed the Voisin family's claim to l'Isle Longue without any further need for a survey or land patent.

Despite an act of Congress confirming the Voisin's claim, the federal land office in New Orleans began selling parts of l'Isle Longue, which was then referred to as Last Island or Isle Derniere, in the 1840's. For the next ten years, Jean Joseph Voisin fought for his family's property through lawsuits filed in state court and by seeking a patent from the federal land office in Washington, D.C. However, after a devastating hurricane in 1856 that killed nearly 300 people including Jean Joseph Voisin's wife and daughter and many of the people claiming title to the property, these fights ceased prior to any judgments being rendered. Because the United States failed to abide by its own treaties and by a valid and enforceable determination by Congress, the State of Louisiana took control of the property in the late 1850's under the guise of the Swamp Lands Grant Act. Ultimately, most, if not all, of the island was sold to the predecessor of Louisiana Land & Exploration Company, which removed significant sums of natural minerals from beneath the surface for over 60 years and then donated the island back to the State of Louisiana in 1997, while retaining 50% of the subsurface mineral rights.

Now, the Voisin family seeks a declaration from this Court that any and all acts transferring this property to anyone other than the Voisins are null and void and an award for all damages incurred by the Voisin family as a result of any such acts.

## II.

## PARTIES

2.

All of the following Plaintiffs are direct descendants of Jean Voisin and have a direct interest in the property subject to the Order of Survey from Don Estevan Miro, the Spanish Governor of the Province of Louisiana, to Jean Voisin, dated October 20, 1788:

a. James Voisin, a person of the age of majority and a resident of the Parish of St. Mary, State of Louisiana;

b. Larry A. Sauce, a person of the age of majority and a resident of the Parish of St. Mary, State of Louisiana;

c. Velma V. Borch, a person of the age of majority and a resident of the Parish of St. Mary, State of Louisiana;

d. Ernest Burns, a person of the age of majority and a resident of the Parish of St. Mary, State of Louisiana;

e. Winona V. Knight, a person of the age of majority and a resident of the Parish of Terrebonne, State of Louisiana;

f. Charles L. Johnson, Sr., a person of the age of majority and a resident of the Parish of St. Mary, State of Louisiana; and

g. Vera V. Compton, a person of the age of majority and a resident of the Parish of St. Mary, State of Louisiana.

3.

Defendant, the United States of America, appears herein as the party who received and held l'Isle Longue in trust and subject to the 1788 Order of Survey from Don Estevan Miro, the Spanish Governor of the Province of Louisiana, to Jean Voisin.

**III.**

**JURISDICTION**

4.

This Honorable Court has subject matter jurisdiction over this proceeding in accordance with 28 U.S.C. § 1331 because it arises under the Constitution, laws, and/or treaties of the United States; 28 U.S.C. § 1332 because it is a class action in which the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs; and 28 U.S.C. § 1346 because the United States is a defendant.

**IV.**

**CLASS ACTION ALLEGATIONS**

5.

Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of a Class, consisting of all those persons who are direct descendants of Jean Voisin.

6.

The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are at least 350 members in the proposed Class.

7.

There are questions of law and fact common to the Class, including without limitation:

a. Whether the 1788 Order of Survey granted Jean Voisin the exclusive and federally protected right to the island now known as Last Island;

b. As of October 20, 1788, what were the mapping coordinates for the Island now known as Last Island;

c. As of October 20, 1788, what was the sub-surface footprint for the Island now known as Last Island;

d. As of October 20, 1788, what was the size and shape of the Island now known as Last Island;

e. Whether the Voisins' claim to Last Island was confirmed by the United States Congress on March 3, 1835;

f. Whether any and all acts by the United States conveying, granting, or transferring title or patents to l'Isle Longue to anyone other than Jean Voisin or his descendants are null and void;

g. Whether the descendants of Jean Voisin are entitled to exclusive possession of, and full dominion and power over, the lands, minerals, and other natural resources subject to the 1788 Order of Survey from the Spanish government to Jean Voisin; and

h. The appropriate measure and extent of damage sustained by Class members.

8.

Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the conduct complained of herein.

9.

Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and litigation involving these types of claims.

10.

The prosecution of separate actions by individual members of the Class would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards for the defendant, and (b) adjudication with respect to individual members of the Class which, as a practical matter, would be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

11.

Further, questions of law and fact common to the members of the Class, such as those identified above, predominate over any questions affecting only individual members.

12.

A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Moreover, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.

## GENERAL FACTUAL ALLEGATIONS

13.

Off the southern coast of Louisiana in the Gulf of Mexico, there lies a chain of narrow barrier islands that were once connected as one island known as "l'Isle Longue." The waters between these islands and mainland Louisiana are now called Caillou Bay and Lake Pelto. To the east of these islands lies a small island called Wine Island. The size and shape of the individual islands

constituting the chain, which are now collectively known as Isles Dernieres or Last Island, have changed significantly through the years and continue to change with the tides, hurricanes, and numerous other environmental elements.

14.

On or about October 20, 1788, Don Estevan Miro, then Spanish Governor of the Province of Louisiana, issued an "Order of Survey" in favor of Jean Voisin, a Frenchman who had relocated to Louisiana, for l'Isle Longue, which order stated:

> A Juan Voisin, una pequeña isla, Vulgarmente Llamada l'Isle Longue situado en él lago de Barataria, lindando de un lado à la Ultima Isla, y del otro haciendo frente à la Isla Nombrado El Vino.

Translated into English, this Order of Survey, which is found in Book No. 4 Orders of Survey Years 1785-99 in the United States Land Office, states:

> To Jean Voisin, a small island, commonly known as *l'Isle Longue* (Long Island), situated in the Lake of Barataria, adjoining (or contiguous to) on one side to the *Ultima Isla* (Last Island), and on the other, fronting the island called *El Vino* (Wine Island).

15.

Upon receiving the grant for l'Isle Longue, Jean Voisin established a permanent camp on the island, continuously living and working there for the next 32 years.

16.

On or about October 1, 1800, Spain ceded to France "the colony and province of Louisiana, with the same extent as it now has in the hands of Spain" in accordance with the Treaty of San Ildefonso.

17.

Pursuant to a treaty between the United States and French Republic dated April 30, 1803, more commonly known as the "Louisiana Purchase," the United States purchased from France "forever and in full sovereignty, the said territory with all of its rights and appurtenances" for $15,000,000.00. 8 Stat. 200, 202 (art. 1).

18.

Article 2 of the Louisiana Purchase specifically set forth the disposition of public property obtained by the United States:

> In the cession made by the preceding article are included the adjacent islands belonging to Louisiana, all public lots and squares, vacant lands, and all public building, fortifications, barracks, and other edifices which are not private property.

19.

Article 3 provided for the disposition of the citizens of this land and their property subject to this treaty:

> The inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; and in the mean time be maintained and protected in the free enjoyment of their liberty, <u>property</u>, and the religion which they profess. (Emphasis added).

20.

Thus, the Louisiana Purchase established two basic rules governing the consequences of the transfer of territorial sovereignty from France to the United States as regards land titles. First, all <u>public</u> lands, including vacant lands and public installations, in Louisiana passed into the federal

public domain. Second, the United States expressly undertook to maintain and protect the "property" of the inhabitants of the ceded territory.

21.

By an act of Congress dated March 26, 1804, the Louisiana Purchase area was divided, for administrative purposes, into two territories, named "Orleans" and "Louisiana." Although the eastern and western boundaries were not defined at the time, the Territory of Orleans corresponds, more or less, to the present state of Louisiana, including l'Isle Longue.

22.

Due to many reports of fraudulent land transactions, Congress established certain rules in regard to Louisiana lands in the March 26, 1804 Act. First, it expressly invalidated all grants, titles, and claims based on acts of the former sovereign after April 30, 1800 (the date of the Treaty of San Ildefonso). Second, it validated grants or claims, up to one square mile of land, if made to bona fide actual settlers pursuant to the "laws, usages and customs of the Spanish government." Third, it prohibited, and made punishable, any settlement or survey of Louisiana federal public lands until the enactment of more detailed legislation on the subject.

23.

By an Act dated March 2, 1805, Congress established a three-step process for confirming the land claims of actual settlers of Orleans Territory based on duly registered warrants or orders of survey of the Spanish or French governments issued before October 1, 1800. First, such claims, without supporting evidence, were to be filed with the Registers for Orleans Territory or the Recorder of Land Titles for Louisiana Territory. Second, these officials, together with two further public officials appointed for such purpose, were to form Boards of Commissioners for the

ascertaining and adjusting of land claims in their respective districts, and these Boards were to "hear and decide in a summary manner," by majority vote, on the claims brought before the Registers or Recorders. Third, these decisions were to be "laid before Congress ... and be subject to their determination thereon."

24.

Section 7 of that same Act extended the jurisdiction of the United States surveyor south of Tennessee to "all the public lands of the United States, to which the Indian title has been, or shall hereafter be extinguished, within the said territory of Orleans," and directed the surveyor to cause these lands to be "surveyed, and divided, as nearly as the nature of the country will admit, in the same manner, and under the same regulations as is provided by law, in relation to the lands of the United States northwest of the river Ohio."

25.

Under the statutory system for the verification and confirmation of land claims based on acts of the foreign sovereign as applicable to the Orleans Territory, there was a tripartite scheme of land rights: (1) rights based on complete title by virtue of grant by the former sovereign, which title remained valid; (2) rights based on warrants or orders of survey of the former sovereign not carried to title, which were subject to administrative verification and adjudication, as well as subsequent action by Congress; and (3) lands which passed to the United States as part of the federal public domain.

26.

By an Act dated April 21, 1806, 2 Stat. 391, Congress, among other things, divided the Orleans Territory into two districts (eastern and western) and authorized the sale of surveyed United

States public lands within the western district, but not the eastern district which included l'Isle Longue.

27.

By an Act dated April 8, 1812, 2 Stat. 701, 703, Louisiana was admitted into the Union as the 18th state "on equal footing with the original states, in all respects whatsoever." As for the southern boundary, the Act recited that Louisiana was "bounded by the said gulf [of Mexico] ... including all islands within three leagues of the coast." Thus, as of April 1812, all landholders in Louisiana were additionally protected under the United States Constitution, as well as those guarantees set forth in the Louisiana Purchase.

28.

On August 10, 1820, after continuously living and working on l'Isle Longue for over thirty years without legal contest, Jean Voisin died at the age of 70, leaving a daughter, Catherine Voisin, who subsequently died without children on August 30, 1824, and a son, Jean Joseph Voisin, who continued to live on and maintain l'Isle Longue until his death in 1874.

29.

By an Act dated July 4, 1832, entitled "An Act for the final adjustment of the claims to lands in the south-central land district of the State of Louisiana," Congress authorized "any person or persons, claiming lands within the limits of south-eastern land district of the state of Louisiana, agreeably to the provisions of the laws heretofore enacted for the adjustment of land claims in that part of the territory of Orleans or state of Louisiana, but whose titles have not been heretofore confirmed," to "present their claims within a specified time period" together with the written

evidence and other testimony in support of the same, to the Register and Receiver of the federal land office at New Orleans.

30.

Section 2 of the July 4, 1832 Act directed the Register and Receiver to submit a report of all pending land claims to the Secretary of the Treasury:

> That the said register and receiver shall, at or before the beginning of the next session of Congress, make to the Secretary of the Treasury a report of the claims which may have been preferred before them, together with the testimony, their opinion of the validity of the claims, and such other information respecting them as may be in their possession; which report shall, by the Secretary of the Treasury, be laid before Congress as soon as practicable, with his opinion touching the validity of the respective claims; *Provided*, That no claim shall be therein recommended for confirmation, for more than the quantity contained in a league square.

31.

In approximately July of 1833, Jean Joseph Voisin formally submitted his family's claim to the Register and Receiver in New Orleans with the necessary evidence, including the October 30, 1788 Order of Survey from Governor Miro and an affidavit from Charles Carel dated July 1, 1833, which stated in part:

> ... that He is well acquainted with the Island described in the above order of Survey, and that the same was granted to Jean Voisin, who established upon it before the year 1800, a manufacture of tree wax; that the said Voisin raised cattle on said island, made oil, and followed divers[e] other pursuits – That from the time of the Concession, it has always been in his possession or in that of those who held for him.

32.

On September 5, 1833, the New Orleans Register and Receiver prepared a report which was submitted to the Secretary of the Treasury on January 9, 1834, and subsequently to the Speaker of the House of Representatives on January 29, 1834. This report was divided into four parts: 47

complete French or Spanish grants or concessions (Class A); 53 incomplete titles such as orders or warrants of survey (Class B); 251 claims based on cultivation or possession for ten years after the changes of sovereignty (Class C); and ten claims embraced within the Section 4 of the Act of July 4, 1832 (Class D).

33.

The claim of Jean Joseph Voisin for l'Isle Longue was identified as No. 50 of the Class B claims, immediately following another of his claims for unrelated property in Plaquemines Parish, Louisiana:

> No. 50.
>
> Jean Voisin also claims another tract of land, being a small island, situate[d] in the lake of Barataria (parish of Jefferson) and commonly called l'Ile Congue [sic], containing about six hundred superficial arpents, and fronting on one side another small island called El Vino.
>
> The said island is claimed in virtue of a regular order of survey issued therefor in favor of the said claimant, by Governor Estevan Miro, on the 3d day of October, 1788, and of continued occupation and possession thereof ever since. **We are, therefore, of opinion that this claim ought to be confirmed.**

6 American State Papers, Public Lands at 678 (emphasis added).

34.

The parenthetical phrase "parish of Jefferson" in No. 50 was not a part of the original description of the property submitted by Voisin to the United States Land Office. Nor was the size of "six hundred superficial arpents" in the 1788 Order of Survey. Rather, the persons responsible for preparing the claim in the New Orleans Land Office apparently added the phrase "parish of Jefferson" and the size description to the claim and also incorrectly referred to the island as "l'Ile Congue."

35.

On March 3, 1835, Congress adopted the "act supplementary to the act of the fourth of July, eighteen hundred and thirty-two, entitled 'an act for the final adjustment of the claims to the lands in the south-eastern district of Louisiana,'" which provided in pertinent part:

> [T]he claims for lands within the south-eastern district of the state of Louisiana, described by the register and receiver of the said district, in their report to the Secretary of the Treasury, bearing date the fifth of September, eighteen hundred and thirty-three, at New Orleans, be, and the same are hereby confirmed against any claim on the part of the United States, except the different applications hereinafter specified, to wit: ... In class B, of said report, the following numbers, twenty-six, twenty-eight, twenty-nine, nineteen, twenty-three, forty-seven, thirteen, thirty-five, forty-two, and forty-three.

4 Stat. 779, 780.

36.

Thus, as of March 3, 1835, Jean Joseph Voisin's claim to l'Isle Longue was confirmed against any claim of the United States, with no requirement for a subsequent survey or patent.

37.

On October 13, 1837, the United States entered into a contract with Gilmore F. Connely to survey parts of south Louisiana, including the area around l'Isle Longue, which Mr. Connely completed in or about February 1838 and was approved by the Surveyor General of Louisiana on December 8, 1842. This survey failed to mention or refer to the Congressional confirmation of l'Isle Longue to Jean Joseph Voisin on March 3, 1835.

38.

Starting in or about 1847, the United States Land Office in New Orleans began issuing patents for various lots of land on l'Isle Longue, which by that time was being called Last Island or