Isle Derniere, to persons who desired to have a summer residence on the coast of the Gulf of Mexico, despite Congress's confirmation of the Voisin's claim to l'Isle Longue. Shortly thereafter, these alleged patent holders began establishing themselves on the island, mainly building summer vacation homes and a large, exclusive resort.

39.

As a result of these intrusions, Jean Joseph Voisin inquired with the General Land Office in order to challenge the validity of these patents being issued. In early 1850, the Commissioner of the General Land Office in Washington D.C., J. Butterfield, began corresponding with the Louisiana Surveyor General, Robert W. Boyd, about the Voisin claim to l'Isle Longue. In a letter dated May 11, 1850, Mr. Boyd informed Mr. Butterfield that the Voisin claim, Class B No. 50, "has not yet been surveyed, nor has any order for its location been issued by this office. The only townships adjoining Lake Barataria which have had surveys are T.19 R24 & 25E - T.21 R.24, 25 & 26E, and upon these no islands of the name of 'L'Isle Longue' appears to have been surveyed."

40.

Mr. Boyd's confusion over the exact location of the Voisin family's claim derives from the reference to the 'Lake of Barataria' in the 1788 Order of Survey. Although much of the water along the south-central coast of Louisiana was referred to as Barataria by the Spanish during their control of the Louisiana province, this name was dropped during the transfer of power to France (and then the United States) and became known as Caillou Bay. The only 'Barataria' at that time of the survey, and to this day, was the Bay of Barataria, which is located in Jefferson Parish, Louisiana, about 60 miles east of l'Isle Longue.

41.

On September 5, 1850, the Register for the General Land Office in New Orleans, Charles Fitz, wrote another letter to Mr. Butterfield, defending his decision to grant patents to other persons on Last Island. Mr. Fitz explained that, in his opinion, Jean Joseph Voisin's claim was frivolous because the area now known as Last Island is too big to be the "small" island described in the Order of Survey, and that the Order of Survey grants an island bounded on one side by 'Last Island' and so it cannot mean Last Island itself. Mr. Fitz further states that the island recently had become a desirable "watering place" and property values had been, and were expected to continue, increasing significantly.

42.

On January 8, 1852, Mr. Fitz sent Mr. Butterfield three affidavits from Thomas Jones, Jacques Terrebonne, and Lange Lanata, all of whom supported Jean Joseph Voisin's claim. Mr. Jones' affidavit stated that the island was originally called Long Island and is now called Last Island; that he went there 46 years ago (in 1806) and saw Jean Voisin; that Jean Joseph Voisin lives there now; and that the island has changed in size and shape over the years. Mr. Terrebonne's affidavit stated that he was acquainted with Jean Voisin in 1802 on what was then known as Long Island, west of Wine Island, but is currently known as Last Island. Mr. Lanata's affidavit stated that he was acquainted with Jean Voisin on Long Island, now called Last Island, west of Wine Island in 1812; and that, at that time, a bayou carved out part of the island into a smaller portion then called Last Island.

43.

After these affidavits were submitted, Jean Joseph Voisin's attorney, F. C. Laville, asked the General Land Office Commissioner, Mr. Butterfield, to make a decision on the claim. Because no decisions were forthcoming, Mr. Laville continued sending letters to Mr. Butterfield and other government officials throughout 1852 and 1853.

44.

Then, on October 10, 1853, the new Commissioner of the General Land Office, John Wilson, directed the Register and Receiver in New Orleans to take testimony and "make a final examination of the matter after due notice to all parties interested, and to report the result for definitive action of this office."

45.

In January and February of 1854, four witnesses, one of whom had submitted an affidavit in 1852, were deposed under oath by the Register and Receiver in New Orleans about the Voisin family's claim to what was then known as Last Island.

46.

On January 28, 1854, Mr. Terrebonne testified in his deposition, like he had sworn in his earlier affidavit, that he first visited the island in 1802 and ten times since then; that he was familiar with all of these islands, including the island known as "Isle Longue" or "Isle a Voisin." He also testified that "Jean Voisin, the father of the present claimant, resided there" when he (Terrebonne) stayed there once for 40 days. He described the island as only being "about 5 miles of firm land, but that there was an additional 13 miles more of low land suitable for hunting, but covered with water at high tides," and that a small island called "Isle au Vin" or "Wine Island" was just to the east of

this island. Mr. Terrebonne also testified that "[t]he entire coast from Grand Terre [now known as Grand Island] to Pointe au Fer Mouth of the Atchafalaya, was formerly, say 50 years ago, called Barataria ..." Under cross examination, Mr. Terrebonne stated that he was also familiar with the "sea coast between Grand Terre and Bayou Bastien," which is now called Barataria Bay, and that he "knows of no island there called Isle Longue or Long Island."

47.

Mr. Laville, Jean Joseph Voisin's attorney, submitted a sketch of the island and testified that the bayou between the land that was originally referred to as Last Island and Long Island had filled up, such that the two islands were no longer separated.

48.

On February 1, 1854, Jerome Moreno testified that he was a navigator on the Louisiana seacoast and was familiar with the island which everyone called "Isle Longue;" that Long Island and Last Island used to be separated by a bayou which was called "Bayou Voisin" and had since disappeared; that Wine Island was to the east of Long Island; that, when he visited, the island was occupied by Pierre Dinet, Jean Voisin's partner in the fishing business; and that the island had approximately 12 miles of firm ground.

49.

Judge John Moore testified on behalf of the opponents to the Voisin claim. He stated that he visited the island frequently between 1828 and 1839; that he had never heard it called anything but Last Island; that he had never heard of waters being called Barataria Bay; that the pass between Last Island and Wine Island was about one-quarter mile wide; that Mr. Laville's sketch was a pretty good representation of the island; and that the island was uninhabited.

50.

On September 12, 1854, James N. Wafford, through his attorney G. F. Connely (likely the same person who incorrectly surveyed the land in 1837), filed a civil lawsuit against Jean Joseph Voisin in Louisiana state court (Case No. 1284), seeking to determine the title to Last Island. Jean Joseph Voisin subsequently countersued Mr. Wafford and filed separate suits against several other alleged patent holders.

51.

During the next two years, the Waffords and Voisins pursued the lawsuit, taking many depositions and filing several briefs. Additionally, the Voisins, as well as other persons claiming title to the property and the New Orleans register, wrote several letters to the General Land Office, requesting a final decision on the Last Island matter.

52.

On August 10, 1856, a devastating hurricane swept through Last Island and into Louisiana, killing an estimated 320 people, including 140 people on the island, most of whom were staying at a resort hotel recently built thereon. All buildings on the island were destroyed and parts of the island itself were washed away from the winds and water. Many of the alleged patent holders and plaintiffs in the lawsuits, as well as Jean Joseph Voisin's wife Jeanne Amelie Clause and daughter Marie Amelie, died in the hurricane. Jean Joseph Voisin and his two sons, Joseph and Leonard, survived.

53.

Because of this tragedy, the lawsuits pending over the title to this land did not proceed any further, resulting in no judgments either for or against the Voisin family.

54.

During these legal battles over the title to land on Last Island, Congress passed the Swamp Lands Grant Act of March 2, 1849, which was intended "to aid the State of Louisiana in draining the Swamp Lands therein." 9 Stat. 352. Although lands subject only to overflow of tide water, like l'Isle Longue, were not considered swamp lands within the purview of the act, the Swamp Lands Grant Act specifically excluded private property:

> [A]s soon as the Secretary of Treasury shall be advised, by the Governor of Louisiana, that the State has made the necessary preparation to defray the expenses thereof, he shall cause a personal examination to be made, under the direction of the surveyor-general thereof, by experienced and faithful deputies, of all the swamp lands therein which are subject to overflow and unfit for cultivation; and a list of same to be made out, and certified by deputies and surveyor-general, to the Secretary of the Treasury, who shall approve the same, **so far as they are not claimed or held by individuals**; and on that approval, the fee simple to said lands shall vest in the said State of Louisiana, subject to the disposal of the legislature thereof.

Sec. 2, 9 Stat. at 353 (emphasis added). Thus, by express provision of the statutory grant itself (and by command of the Constitution), the Voisin's property right was not taken away by this grant of naked title to Louisiana.

55.

In fact, when Congress subsequently authorized the issuing of patents to Louisiana for the swamp and overflowed lands selected by them, it expressly provided that such patents could encompass only lands that "shall remain vacant and unappropriated, and not interfered with by an actual settlement under any existing law of the United States." Act of March 3, 1857, 11 Stat. 251.

56.

Notwithstanding the foregoing provisions, the State of Louisiana began taking over control of the majority of Last Island pursuant to the Swamp Lands Grant Act, and then sold or donated portions of the island to various individuals.

57.

Since or about the late 1980's, various members of the Voisin family have inquired unsuccessfully into the validity of their family's title claim to Last Island, Louisiana. In a letter dated February 21, 1990, A. Nate Felton, Chief of the Southern Adjudication Section of the Bureau of Land Management responded to one such inquiry and confirmed the Voisin claim:

> The records on file in this office, the National Archives and Louisiana Department of Natural Resources indicate that T. 24 S., R. 15 E., S.E. District, State of Louisiana, was encompassed by the private land claim of Jean Voisin, confirmed by Sec. 1, Act of March 3, 1835 (4 Stat. 779, 780) entitled "An Act for the final adjustment of the claims to land in the south-eastern district of Louisiana." Reference was also found in 6 American State Papers 665, 666, 667, 673, and 702, Gales and Seaton Edition (1934) under Certificate No. 50 ...
>
> Records obtained from the Federal Records Center failed to disclose the patent certificate referred to above. Please be advised, the fact that patents were not issued does not affect the title of said lands. The confirmation of the Voisin claim through the above cited act released the United States of any claim to said lands. This Bureau has no jurisdiction over land after they have been patented and/or confirmed; title thereto vests in the patentee. Thereafter, the lands become privately owned and subject to the laws of the State, and all transactions that subsequently affect title to those lands are recorded in the local county records.

58.

Despite this statement in 1990, the Bureau of Land Management's Office of Cadastral Survey claimed six years later that it was unable to locate a reference to Jean Voisin's Claim No. 50 in the survey field notes of G. F. Connely and, thus, did not believe the claim covered Last Island. The

Office of Cadastral Survey also claimed that Last Island could not be the land identified in the 1788 Order of Survey since it only referenced a 'small island.' However, the term "small" is obviously subjective, especially because when Governor Miro wrote the Order of Survey in 1788, he had recently returned from a visit to Cuba which is a rather large island in comparison to l'Isle Longue.

59.

On April 10, 1998 – after further inquiries from Voisin family members and various congressional representatives – Janet A. Goodwin, a Field Solicitor from the Division of Resources, Planning, Use and Protection of the United States Department of the Interior, produced an analysis of the Private Land Claim of Jean Voisin for Last Island, Louisiana. In her analysis, Ms. Goodwin reviewed many of the same facts set forth above. Although Ms. Goodwin did not reach a conclusion as to the validity of the claim, she did agree that the Voisins had "some very compelling evidence" and that the present-day Last Island is one and the same as the Long Island identified in the 1788 Order of Survey:

> If [the Voisin family] can prove Voisin and his family had a settlement on Last Island in the 1800's, the link between Long Island and Last Island would be strengthened. In fact, if they can prove habitation on the island at all by Voisin, it bolsters their story - it is unlikely that Voisin was granted a particular island and then settled on the wrong one.

60.

In her report, Ms. Goodwin also recognized the significance of Wine Island fronting Last Island, as it was exactly described in the 1788 Order of Survey:

> The most serious defect in the [Bureau of Land Management's] position, is the existence of Wine Island, both in 1788 and 200+ years later. Today, Wine Island is on one side of Last Island. If the BLM ever needs to defend its position that Last Island is not the island granted to Voisin, it will need to explain away Wine Island, or locate another Wine Island in the present-day Barratatia [sic] Bay.

61.

Upon information and belief, the only "Wine Island" on the gulf coast of Louisiana lies directly east of Last Island. There is no island, and there has never been an island, in Barataria Bay called "Wine Island."

62.

Although Ms. Goodwin did not present a final conclusion, she stated that she wanted to "conduct further research," but that she would need additional funds and assistance from the Bureau of Land Management staff.

63.

Because of differing views within the Bureau of Land Management, certain Senate and Congressional members released a statement in the United States Congressional Record on September 29, 2000, encouraging further investigation into the Voisin claim:

> The managers encourage the [Bureau of Land Management] to conduct a full investigation, including review of documents and evidence provided by the Voisin family to determine if the government transferred the ownership of Last Island, Louisiana while the property was owned by ancestors of the Voisin family. Should the BLM determine that the property was transferred inappropriately, the report shall include recommendations for the resolution of this issue.

146 Cong. Rec. H 8472.

64.

Instead of complying with Congress's statement or even providing Ms. Goodwin with the funds and staff she requested, another agent from the Bureau of Land Management issued a report six months later, in April 2001, that merely attached the prior findings by the Office of Cadastral Survey which were based on the flawed surveys prepared by G. F. Connely in the late 1830's.

65.

Upon information and belief, no further action has been taken by any federal or state agency.

66.

Today, the four islands – Raccoon Island, Whiskey Island, Trinity Island, and East Island – which were once a single island known as l'Isle Longue are uninhabited and without any existing structures.

## VI.

## FIRST CAUSE OF ACTION
**Declaratory Judgment**

67.

Each of the foregoing paragraphs is incorporated herein by reference.

68.

The United States holds title to the public lands of the nation, not as ordinary proprietor, but in trust for all of the people of the United States.

69.

Article IV, Section 3, Clause 2 of the Constitution of the United States vests Congress with the power to administer that trust:

> The Congress shall have power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; and nothing in this Constitution shall be so construed as to Prejudice any Claims of the United States, or of any particular State.

Thus, the legislative and proprietary powers over the public domain vested in Congress is exclusive, supreme, plenary, and without limitation. Indeed, neither the courts nor executive agencies may proceed contrary to an Act of Congress in this constitutional area of national power.

70.

The validity and construction of contracts through which the United States exercises its constitutional functions, as well as their consequences on the rights and obligations of parties or the titles or liens which they create or permit, present questions of federal law and are not controlled by the law of any state.

71.

Jean Voisin received a valid and enforceable land grant to l'Isle Longue from the Spanish government pursuant to an Order of Survey dated October 20, 1788.

72.

According to the treaty between the United States and France dated April 30, 1803, the United States expressly undertook to maintain and protect such private land grants when it purchased the territory of Louisiana from France.

73.

Congress expressly approved and confirmed Jean Voisin's right and title to l'Isle Longue on March 3, 1835.

74.

The island that was identified as l'Isle Longue in the October 20, 1788 Order of Survey is the same as the series of islands presently known and referred to as Isles Dernieres on the southern gulf coast of Louisiana.

75.

The United States was without authority or jurisdiction to convey, grant, or transfer l'Isle Longue, or any portion thereof, to anyone other than Jean Voisin or his descendants at any time.

76.

The Voisin's title to l'Isle Longue was and remains still a federally protected right, and as such is not subject to claims of adverse possession or its civil-law equivalent, acquisitive prescription.

77.

Alternatively, to the extent the Voisin's claim to l'Isle Longue was never consummated by a patent, naked title to the lands encompassed by that claim was and remains still in trust with the United States, and as such is again not subject to claims of adverse possession or its civil-law equivalent, acquisitive prescription.

78.

Therefore, any attempted conveyance of l'Isle Longue, or any portion thereof, was inoperative and void, no matter with what seemingly regularity the forms of law may have been observed.

79.

There is a genuine and ripe controversy for which Plaintiffs seek a declaratory judgment, in accordance with Fed.R.Civ.Pro. 57 and 28 U.S.C. § 2201, finding that (a) any and all acts conveying, granting, or transferring title or patents to l'Isle Longue (also known as Long Island, Last Island, or Isles Dernieres) to anyone other than Jean Voisin or his descendants are null and void, and (b) the direct descendants of Jean Voisin are entitled to exclusive possession of, and full dominion and power over, the lands, minerals, and other natural resources subject to the 1788 Order of Survey from the Spanish government to Jean Voisin.

VII.

## SECOND CAUSE OF ACTION
**Unlawful Taking**

80.

Each of the foregoing paragraphs is incorporated herein by reference.

81.

To the extent Last Island is not judicially returned to Plaintiffs, the United States' exercise of its power of eminent domain over this property constitutes a taking of private property for public use.

82.

The United States' failure to return Last Island to Plaintiffs for over one hundred and fifty years constitutes a taking of private property for public use.

83.

The United States did not compensate Jean Voisin or his descendants for this taking, in violation of the Fifth Amendment to the United States Constitution.

84.

As a result, Plaintiffs have sustained serious and significant economic losses and should be awarded the damages they have sustained resulting from the United States' actions.

VIII.

## PRAYER

**WHEREFORE**, Plaintiffs James Voisin, Larry A. Sauce, Velma V. Borch, Ernest Burns, Winona V. Knight, Charles L. Johnson, Sr., and Vera V. Compton, respectfully pray that the

foregoing Class Action Complaint be filed and served, and, after all due proceedings, judgment be entered in their favor and against defendant, as follows:

1. Determining that this action is a proper class action, certifying Plaintiffs as class representatives, and appointing Plaintiffs' counsel as Lead Counsel, in accordance with Rule 23 of the Federal Rules of Civil Procedure;

2. Declaring that any and all acts conveying, granting, or transferring title or patents to l'Isle Longue (also known as Long Island, Last Island, or Isles Dernieres) to anyone other than Jean Voisin or his descendants at any time were null and void;

3. Declaring that the direct descendants of Jean Voisin are entitled to exclusive possession of, and full dominion and power over, the lands, minerals, and other natural resources subject to the 1788 Order of Survey from the Spanish government to Jean Voisin;

4. Alternatively, entering an award against the United States for in excess of a hundred million dollars, or all damages sustained as may be reasonable;

6. Entering an award for all reasonable attorney's fees and costs of these proceedings, as well as judicial interest on all damages from the earliest date provided by law; and

7. Granting all other relief deemed just and equitable by this Court to which Plaintiffs may be entitled.

Dated: April 9, 2007.

Respectfully submitted,

**GLADSTONE N. JONES, III (LA. BAR NO. #22221), T.A.**
**LYNN E. SWANSON (LA BAR ROLL NO. #22650)**
**JONES, VERRAS & FREIBERG, L.L.C.**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 523-2500
Facsimile: (504) 523-2508

**ANDREW L. KRAMER (LA. BAR NO. #23817)**
**ELKINS, P.L.C.**
201 St. Charles Avenue, Suite 4400
New Orleans, Louisiana 70170
Telephone: (504) 529-3600
Facsimile: (504) 529-7163

**FRANK C. DUDENHEFER, JR. (LA. BAR NO. #5117)**
**THE DUDENHEFER LAW FIRM, L.L.C.**
601 Poydras Street, Suite 2655
New Orleans, Louisiana 70130
Telephone: (504) 525-2553
Facsimile: (504) 523-2508
**Counsel for Plaintiffs**